UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARCUS MARTINEZ,

               Plaintiff,

    v.

SAINT-GOBAIN PERFORMANCE PLASTICS
CORP., HONEYWELL INTERNATIONAL INC.
f/k/a ALLIED-SIGNAL INC. and/or
ALLIEDSIGNAL LAMINATE SYSTEMS, INC.,
E.I. DUPONT DE NEMOURS AND COMPANY,
and 3M CO.,

               Defendants.

Civ. No.  1:19-cv-98 (LEK/DJS)

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

Plaintiff, by his attorneys, as and for his complaint against defendants, alleges as follows:

**PARTIES**

1.     Plaintiff is a resident of the County of Rensselaer, State of New York currently residing at 10 Richmond Ave., Hoosick Falls, New York.

2.     Defendant Saint-Gobain Performance Plastics Corp. ("Saint-Gobain") is and was at all times relevant hereto a corporation organized under the laws of California with its principal executive office located at 750 East Swedesford Road, Valley Forge, Pennsylvania.  Saint-Gobain is registered to do business as a foreign corporation in the State of New York.  Saint-Gobain employs approximately 1,200 people in New York.

3.     Defendant Honeywell International Inc., formerly known as Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., is a Delaware corporation with its principal executive office located at 115 Tabor Road, Morris Plains, New Jersey.  Honeywell is registered to do business as a foreign corporation in the State of New York.

1

4.      In 1999, Allied-Signal Inc. (Allied-Signal) acquired Honeywell.  The combined company adopted Honeywell's name because of superior name recognition.

5.      Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies.  Together, these companies had operated in the United States since at least the early 1920s.  Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

6.      At all relevant times, AlliedSignal Laminate Systems, Inc. was a unit of Allied-Signal.

7.      Defendants Saint-Gobain and Honeywell, at various times relevant herein, and as described more fully below, operated manufacturing facilities at or around 14 McCaffrey Street, Hoosick Falls, New York, and 1 Liberty Street, Hoosick Falls, New York.  Defendant Honeywell also operated facilities on John Street and Lyman Street in Hoosick Falls, New York, and on River Road in Hoosick Falls, New York.

8.      Defendant E.I. DuPont deNemours and Company ("DuPont"), is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principal executive office located at 974 Centre Rd., Wilmington, DE.  DuPont is registered to do business as a foreign corporation in the State of New York.  Defendant DuPont manufactured and sold ammonium perfluorooctanoate (APFO) and/or polytetrafluoroethylene (PTFE) dispersions containing APFO to defendants Saint-Gobain and Honeywell that were used at these defendants' facilities in their manufacturing processes as described herein.

9.      Defendant 3M Co. ("3M") is and was at all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center Building 220-11W-02, Saint Paul, Minnesota.  Defendant 3M manufactured and sold APFO to

defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

10.     Defendant 3M manufactured and sold APFO to DuPont and other manufacturers for inclusion in PTFE dispersion products at least through 2000 that were sold to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

11.     Defendant DuPont manufactured and sold APFO after 2000 to other manufacturers for inclusion in PTFE dispersion products up through 2015 that were sold to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein. Defendant DuPont also sold APFO directly to defendants Saint-Gobain and Honeywell between 2000-2015.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court pursuant 28 U.S.C. § 1332(a)(1), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant Saint-Gobain conducts substantial business in this District, and all Defendants have caused harm to plaintiff in this District.  Plaintiff also resides in this District.

## JURY DEMAND

14.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

15.     Ammonium Perfluorooctonoate (APFO) dissociates in water to form perfluorooctanoate (PFO⁻) and under acidic conditions is protonated to form perfluorooctanoic acid (PFOA).[1]

16.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as perfluoroalkyl substances (PFASs) or perfluorochemical compounds (PFCs) that include perfluorooctane sulfonic acid (PFOS).

17.     PFOA and all PFCs are human-made chemicals that are not found in nature.  PFOA is highly water soluble and its particulate matter quickly and easily dissolves into rainwater and other precipitation and then readily percolates down to contaminate groundwater.

18.     Defendant 3M is the inventor and original manufacturer of PFOA having begun manufacturing the chemical in approximately 1947 at its Cottage Grove plant in Minnesota.  It ceased manufacturing it in or about the year 2000.

19.     Defendant DuPont began using PFOA (also referred to as C-8) in dispersion polymerization in the manufacture of fluoropolymers at its Washington Works plant in West Virginia in the 1950s.

20.     Defendant DuPont began manufacturing PFOA after defendant 3M chose to stop making the chemical in 2000 and DuPont then continued to use PFOA in its manufacturing processes after 2000.  Defendant DuPont also sold PFOA to other manufacturers of PTFE dispersions once it took over manufacturing the chemical from 3M after 2000.

---

[1] For purposes of this complaint, APFO, PFO⁻ and PFOA will all be generically referred to as "PFOA".

21.   Historically, PFOA was used as a polymerization aid and as a dispersion and wetting agent in the manufacturing of fluoropolymers.   PFOA was also used in a variety of consumer products to achieve water, oil, and grease repellency.

22.   Prior to 2015 companies utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

23.   PFOA was also a key component in the manufacturing of PTFE (Teflon®) and other similar coatings.  In this process, PFOA is used as a surfactant, dispersing and wetting agent. It is not intended to be incorporated into the final product, although trace amounts remain.

24.   PFOA is a white solid at ambient temperature, but exists as a vapor when heated during the process of PTFE (Teflon®) manufacturing and coating.  When PTFE coatings are heated PFOA vaporizes out of the PTFE dispersion and exits through stacks in manufacturing facilities.  When hot PFOA vapor exits through the stacks and cools, it condenses back into solid form and, within minutes, it coagulates and forms micro-sized particulates ranging from 0.1 um to 1 um in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed from the atmosphere by precipitation (wet deposition).

25.   Due to its chemical structure, PFOA is biologically and chemically stable in the environment and is resistant to environmental degradation processes.  It is particularly persistent in water and soil and, because PFOA is water-soluble, it can migrate readily from soil to groundwater.  PFOA remains present in the environment long after it is initially released.

26.   In 2006, EPA implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies, including defendants DuPont and 3M.  The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and

5

chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions and products by 2015. According to EPA, all eight companies that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

**PFOA-Associated Health Risks**

27.     There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (less than 1.0 part per billion (ppb)).

28.     Defendant DuPont had received inquiries regarding the toxicity of PFOA as early as 1954 and began to be concerned about its toxicity.

29.     In or about 1961 toxicologists working for defendant DuPont concluded that PFOA was toxic. Its toxicology section chief stated it should be "handled with extreme care." DuPont researchers also found that exposure to PFOA causes an increase in the size of the livers in rats and rabbits. In 1962 the same effect was discovered by DuPont scientists when PFOA was ingested by dogs. Internal documents from defendant 3M show that company scientists had been aware of the health risks of PFOA as early as the 1960s.

30.      In 1970, defendant DuPont became aware that a large group of company foremen and salesmen at its Washington Works facility in West Virginia where Teflon ® manufacturing took place, had higher incidence rates of myocardial infarction, cerebrovascular disease, diabetes mellitus and cancer than its high level executives at the facility who were not involved directly in manufacturing operations.

31.     In 1976 researchers from the University of Rochester, New York published a report that showed widespread contamination of human tissues with organofluorine compounds (organic

compounds that contain the carbon-fluorine bond) which likely derived from commercial sources such as PFOA.  The authors contacted defendant 3M questioning whether its consumer products containing these compounds could be the source.  J.D. LaZerte of 3M advised W.S. Guy, one of the researchers on the project, "not to speculate" on the source of the organofluorine compounds found in human tissues and, upon information and belief, 3M took no further action to investigate this issue.

32.     By 1978, defendant 3M had found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

33.     When defendant DuPont learned of these elevated levels in 3M workers, it too began an internal review to determine their C-8 (PFOA) concentrations and documented high concentrations of PFOA in the blood of its factory workers at its Washington Works plant in West Virginia, showing that PFOA bioaccumulates and is not easily removed from the body.

34.     In 1978, Bruce Karrh, M.D., defendant DuPont's Corporate Medical Director, published an article in a professional journal stating: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. . . [A] company should disclose health-hazard information.  It should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go. This approach is the correct one, of course and it is the way we try to proceed at DuPont."

35.     By September of 1978 Defendant DuPont had reviewed medical records of 11 operators and 18 laboratory workers with long-term exposure to PFOA and found that more of them than anticipated had abnormal liver function tests (elevated liver enzymes in their blood serum).

36.     In the late 1970s defendant 3M consulted with Dr. Harold C. Hodge of the University of Rochester.  At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls.  "There appears to be indications of liver change from the physical examination results.  In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [one 3M facility] than at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is correspondingly higher."  Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers.

37.     A joint meeting was held in 1979 between defendant 3M's fluorochemical exposure committee and defendant DuPont's Eugene Berman and several of his DuPont colleagues.  Both companies' representatives agreed that since there were no *established* adverse health effects associated with the findings of accumulated fluorochemicals in the blood of workers at the two companies there was no reason to provide an 8E notification under TSCA to the Environmental Protection Agency regarding these findings.  Minutes from the meeting indicate that a discussion transpired between the two companies as to whether they would make any efforts to seek evidence of a possible association between worker blood levels and illness: "DuPont was asked if they had carried out any chronic studies on fluorochemicals in the past and if they planned any in the future. In both cases the answer was negative.  Fluorochemicals have a low priority in their chronic testing program.  They would not carry out such studies unless they were forced to by regulations."

38.     In 1979, Defendant DuPont learned that PFOA caused metabolic abnormalities, including uncoupling of oxidative phosphorylation in rat liver mitochondria that were oxidizing succinate.  It also learned that PFOA seemed to alter the immunochemical reaction of bovine (cow) serum albumin.  It also was aware at that time that: 1) PFOA caused liver enlargement in rats and

death at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) inhaled doses in rats for only four hours could cause liver enlargement and corneal opacity.

39.    Based upon the adverse health effects of PFOA on laboratory animals, in 1979 defendant DuPont established a provisional PFOA acceptable exposure level for its employees of 0.01 mg/m$^3$ in air based upon an 8-hour time-weighted average exposure.

40.    In 1979 Defendant DuPont found increased PFOA levels in the blood of eight workers who worked in the FEP polymerization and TFE dispersion polymerization processes, with the average blood level for PFOA among the eight workers being 8.2 ppm (8,200 ppb).

41.    In 1979 Defendant DuPont was aware that blood test results of its Washington Works employees from 1978 showed that organic fluoride levels were associated with increases in SGOT levels in blood serum.  SGOT (now more commonly referred to as AST) is a liver enzyme which when found at increased levels in blood serum is a sign of possible liver damage.

42.    In 1979, Defendant DuPont was aware "compound-related effects" (effects related to PFOA) were observed in both Rhesus monkeys and Charles River CD rats, but that "monkeys were more severely affected of the two."  It learned that "the data on monkeys suggested increased incidences of chronic interstitial nephritis [kidney damage], hyperkeratosis in the skin and a slight increase in skeletal muscle atrophy …  Similarly, the data on rats suggest hepatocellular necrosis [liver damage], sinusoidal liver congestion and the presence of yellow-brown pigment in the epithelium of the convoluted tubules of the kidney."

43.    By 1979 Defendant DuPont was aware that a 90-day oral study in Rhesus monkeys had been administered at dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys

receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

44.    Early PFOA toxicology studies commissioned by defendant 3M were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported.  The study reports were not submitted to the EPA until 2000, the year defendant 3M decided to stop manufacturing PFOA.

45.    In 1980 PFOA animal toxicity studies were published by Griffith and Long in the JAIHA.

46.    By 1980, defendant DuPont had internally confirmed that PFOA "is toxic", "people accumulate" the chemical in their bodies after exposure and "continued exposure is not tolerable." At this same time defendant DuPont documented that sixteen of its workers had PFOA blood serum levels of between 4.97 ppm and 21.69 ppm (4,970 ppb and 21,690 ppb).

47.    In 1980 DuPont was aware that the rate of first-time myocardial infarctions (heart attacks) in company foreman at its Washington Works facility was almost double what would have been expected.

48.    In materials from a C-8 Communications meeting, dated July 31, 1980, D.E. Steiner, an employee of defendant DuPont, stated: "After 25 years of handling C-8, we see no damage among workers. However, the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

49.     By 1981, defendant DuPont was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus.  PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

50.     By 1981 defendant 3M was aware that PFOA ingestion caused birth defects in rats. Acting on this information defendant DuPont surveyed children born to workers of its Teflon Division and found birth defects in two of seven children born to PFOA exposed workers, both of whom had eye defects.

51.     An experimental study conducted by defendant 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA.  A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals.  In March of 1981, defendant 3M informed defendant DuPont of the rat study.  DuPont then removed all female employees from PFOA exposed jobs, but did not inform them of the reason for their transfer.

52.     By the early 1980's Defendants DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA that Defendants were not sharing publicly.

53.     In 1982, Defendant DuPont calculated that approximately 40 percent of the PFOA vapor inhaled was retained in the blood of human males.

54.     A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high prevalence of high blood pressure and elevation of cholesterol.  No apparent effort was made to compare the incidence of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

55.     On November 23, 1982, Defendant DuPont's Medical Director, Bruce Karrh, MD, wrote in an internal memorandum: a) "Our knowledge of the product health effects of long-term exposure to low levels of C-8 is quite limited"; b) "C-8 is retained in the blood for a long time, creating concern in other areas such as blood donations, etc."; and c) "All employees, not just Teflon area workers, are exposed."

56.     By September of 1984 defendant 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

57.     Thereafter, defendant 3M decided to search to see if it could find any blood samples among its workers that were free of organofluorine compounds.  When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of non-industrial sources of organic fluorine in normal human blood."  3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

58.     By June 14, 1984 defendant DuPont was aware from analysis of blood testing of former Teflon Division employees that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals.

59.     In 1984 defendant DuPont was aware that male operators in the Teflon division that had worked there for many years had complained about difficulty in achieving pregnancy with their wives.

60.     By 1986 defendant DuPont was aware of a cancer morbidity study among its Washington Works employees that showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

61.     By 1987 defendant DuPont was aware through a study conducted of its Chamber Works plant where fluorochemicals were used that there were increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's disease, lung cancer, urinary cancers in men and cirrhosis of the liver in women.

62.     On June 12, 1987, H.A. Smith, of the Safety, Energy & Environmental Affairs office of defendant DuPont's Manufacturing Division made a request to DuPont's Haskell Laboratory that they establish an acceptable level of PFOA in the blood and an acceptable level of PFOA in drinking water.

63.     By 1988 defendant DuPont was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

64.     On March 9, 1988 defendant DuPont first recommended a drinking water limit for PFOA of 1 ug/L (ppb).  This guideline was adopted by DuPont in June of 1991.

65.     In 1989 a study by defendant DuPont of cancer incidence among its Washington Works employees detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

66.     By 1989, defendant DuPont was aware that there were increases in other cancers at its Chamber Works facility as well, including pancreatic, lung, kidney and bladder cancers and Hodgkin's disease.

67.     An internal DuPont memo dated December 14, 1989, entitled "Washington Works: Cancer Incidence and Overall Mortality Rates" indicates that among Washington Works

employees there was an increased incidence over expected of testicular cancer, kidney cancer and other urinary cancers.

68.     By 1990 defendant DuPont was aware that among its Chamber Works employees there was a statistically significant excess of deaths due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver.

69.     A 1990 DuPont internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air. It was found that levels in blood were an order of magnitude or higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body.

70.     In a DuPont report dated April 12, 1990 entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma" by Mark Hurtt and Jon Cook of DuPont's Haskell Laboratory, which reviewed data derived from a 3M animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA exposure was likely to be hormonally mediated.

71.     By October of 1990 defendant DuPont learned that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes.

72.     On March 15, 1991, Wayne H. Martin of defendant DuPont's regulatory affairs department sent a memo that reported on a meeting at which he and other DuPont employees decided that "A warning of potential C-8 hazards (especially from condensate) should be included in MSDSs for all products in which C-8 concentration is 0.1% or more."  It also indicated that all

other "product literature which contains safety or health warnings should be revised to be consistent with MSDS."

73.     In October of 1991 an internal proposal to conduct a cross-sectional study of liver enzyme levels among Washington Works employees with potential exposure to PFOA was rejected by defendant DuPont's management.  In notes from a meeting when this proposed study was considered, a DuPont employee wrote: "Do the study after we are sued."

74.     In the unpublished 1992 thesis of Frank Gilliland, MD who studied the clinical pathology parameters of 111 male workers at defendant 3M's Chemolite plant in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men.  Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

75.     Dr. Gilliland's 1992 unpublished thesis from his 3M worker study also showed thyroid effects in 3M production workers that were associated with organofluorine concentrations in worker blood serum.  A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

76.     An internal document from defendant DuPont acknowledged that at doses of 300 ppm PFOA caused statistically significant increases in adenomas and carcinoma of the liver, pancreas and Leydig cell adenomas in the testis.  Thus, by 1993, DuPont was aware of two animal studies that found that PFOA caused testicular cancer and DuPont knew that PFOA caused cancer at three different anatomical sites among laboratory animals exposed to PFOA.

77.     By 1993 defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

78.     When defendant 3M discussed DuPont's results on cancer in male rats with colleagues from the UK company ICI in 1995, the latter strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

79.     By 1996 defendant DuPont was informed that testing linked PFOA to damage to DNA.

80.     In or about 1996 defendants DuPont and 3M jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical.  By November of 1998 defendants DuPont and 3M were aware that monkeys in this study were suffering from severe health effects.  By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in non-human primates.

81.     As of January of 1997, researchers at defendant DuPont were aware of a hormonally-mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1" Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory wrote:  "The studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation…. The mechanism of tumorigenesis is not completely understood, and therefore

relevance to humans cannot be completely ruled out.  However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system."

82.    A paper published in 1997 by John C. Cook of defendant DuPont together with Eric D. Clegg, concluded: "Occurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]… it should be assumed that humans are potentially susceptible."

83.    In 1999 Dr. Richard Purdy of defendant 3M wrote to his 3M colleagues, Drs. John Buttenhoff and Andrew Seacat that his calculations showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation.

84.    In April of 2000 defendant DuPont rejected its occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

85.    In or about 2000 the United States Environmental Protection Agency notified defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals manufactured by this defendant. Shortly thereafter defendant 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA.  Two of the reasons for defendant 3M's decision were PFOA's bio-persistence and toxicity.

86.    In October of 2001 Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled: A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of

Perfluorooctonoate (PFO) Blood Levels in Humans."   The paper described calculations which showed that ingestion of 1 part per billion of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

87.     In March of 2002 a defendant DuPont website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical.   3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

88.     Before 2003, only one commercial laboratory in the United States had the capacity to detect perfluorocarbons such as PFOA in blood. DuPont's contract with that laboratory prohibited it from testing PFCs for other entities without the consent of DuPont.

89.     In 2003 defendant 3M conducted a mortality study of its workers exposed to PFOS, a chemical closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

90.     A mortality registry kept by defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

91.     In 2006, the U.S. EPA reached a settlement agreement with defendant 3M to resolve 3M's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals.   The agreement did not require 3M to admit the violations, but the company agreed to pay a penalty in excess of $1.5 Million Dollars for 244 separate alleged violations.

92.     In 2009 defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

93.     Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure.  PFOA has a half-life in the human body of 2 to 9 years.  PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys.  Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

94.     PFOA is associated in the medical literature with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions. Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure.  The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.

95.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."  These health conditions can arise months or years after exposure to PFOA.

**Knowledge of PFOA Environmental Contamination**

96.     In 1966 defendant DuPont became aware that perfluorochemicals including PFOA move rapidly in groundwater and migrate into nearby bodies of water.

97.     By August 31, 1966 defendant DuPont became aware that, without pretreatment, a small amount of perfluorocarboxylic acid (the class of pefluorochemicals to which PFOA belongs) dispersing agent, deposited in a landfill would be leached into the groundwater.

98.     By May 13, 1975, defendant DuPont employees in a memo entitled "Investigation of Current Telflon © Waste Disposal" stated: "The problems with disposing of 'Teflon' waste are fear of toxicity, either from 'Teflon' itself or additives in some products.  Although fears of contamination of underground water supplies by 'Teflon' scrap may be exaggerated, the possibility of small amounts of undesirable materials such as 'Triton' © and C-8 being present does exist. For this reason, we have elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

99.     In 1982, defendant DuPont knew that PFOA was contaminating the Ohio River and could be present in drinking water that came from the Ohio River.  An internal DuPont memo dated October 19, 1982 cited analysis and projections of estimated human PFOA exposure from drinking contaminated Ohio River water.

100.    On November 23, 1982, defendant DuPont's then Medical Director, Bruce Karrh, MD, wrote in an internal memorandum that "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter."

101.    By 1984 defendant DuPont became aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community.  Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

102.    By 1984 Defendant DuPont began a program of secretly collecting samples of tap water reported to be from public drinking water supplies near the Washington Works plant and

determining their PFOA levels.  DuPont found that PFOA was present in drinking water samples collected from locations in both Ohio and West Virginia in the vicinity of its Washington Works facility.

103.    By June of 1984 Defendant DuPont was aware that water supplied by the town of Little Hocking, Ohio, which was located "up-river" from the Washington Works plant contained PFOA levels of at least 500 ppt.  Because of the location of the contaminated wells in Little Hocking in regards to the Washington Works facility and the direction of flow of the Ohio River, Defendant DuPont knew that this contamination was caused by PFOA released into the air from its manufacturing facility.  Although Defendant DuPont knew that PFOA was persistent in the environment and that it was continuing to release PFOA into the air meaning that such releases would likely increase the PFOA contamination in Little Hocking's drinking water, Defendant DuPont chose not to alert local, state or federal officials or the public.

104.    By 1985, Defendant DuPont was aware that PFOA was leaching into groundwater beneath digestion ponds that DuPont had previously used to dispose of PFOA contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply of Lubeck, WV, where DuPont found PFOA levels as high as 1,500 ppt.  These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988.

105.    By 1987 Defendant DuPont had conducted air modeling at its Washington Works facility that documented PFOA in the ambient air beyond the fence line of the property and drifting with the wind into nearby communities.

106.    On June 11, 1987 Dr. Karrh, Defendant DuPont's Medical Director, told DuPont officials that the Washington Works plant needed to give "highest priority" to issues associated with the presence of PFOA outside the boundaries of the plant.

107.    In January of 1992 defendant DuPont completed its purchase of the Lubeck wellfield it had previously found to be contaminated with PFOA.  It then tested the new wells that were being used by the Lubeck community for drinking water and found that these wells had even higher levels of PFOA than the old wells, even though the new wells were two miles further away from the Washington Works plant.  DuPont chose not to disclose its findings regarding the PFOA levels in the new Lubeck wells.  The contamination of these wells was not made public until 2001 when the West Virginia Division of Environmental Protection tested the drinking water in Lubeck.

108.    In late 1998 defendant 3M environmental scientist Richard Purdy wrote to his 3M colleague Georjean Adams and suggested that his food chain risk assessment of fluorochemicals produced by 3M once they entered the environment demonstrated a risk that could not be kept confidential.  In another email, Purdy stated "For 20 years the division has been stalling in the collection of data needed for evaluating the environmental impact of fluorochemicals.  PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates it is probably worse."

109.    In 1999 Purdy drafted a resignation letter which stated: "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process.  This has stymied intellectual development on the issue and stifled discussion of the serious ethical implications of decisions."

110.    Shortly after defendant 3M decided to terminate its production of PFOA in 2000, groundwater near the 3M Cottage Grove facility in Minnesota was discovered to be highly contaminated with PFOA.  Subsequently, perfluorinated compound (PFC) contamination including PFOA and PFOS was found in groundwater further away from the facility, in

Washington and Dakota Counties.  In Oakdale, MN the average PFOA concentration in the municipal water was 570 ppt.  Closer to the Cottage Grove facility groundwater levels were measured as high as 619 ppb (619,000 ppt).

111.    The State of Minnesota has determined that over 100 square miles of groundwater have been contaminated by defendant 3M's disposal of PFCs and the source of residential drinking water for over 125,000 Minnesotans has been affected by PFC waste disposal.

112.    Upon information and belief, defendants 3M and DuPont shared information about the environmental contamination potential of fluorochemicals such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one defendant was made known to the other.

**PFOA Drinking Water Limits**

113.    In 2009, the EPA identified PFOA as an emerging contaminant of concern and issued a provisional health advisory stating that short term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects.  The provisional health advisory stated that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

114.    In May 2017, Minnesota established a health guidance value for PFOA in drinking water of 0.035 ppb (35 ppt).

115.    In 2007, New Jersey established a preliminary health-based guidance level of 0.04 ppb (40 ppt) in drinking water.

116.    In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

117.    In May 2016, EPA replaced its 2009 provisional health advisory with a new lifetime advisory.  The 2016 lifetime health advisory established that the presence of PFOA in drinking

water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA.  EPA health advisories are non-enforceable on the states. EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by EPA as an "estimate[] (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

118.    In November of 2017 the State of New Jersey announced it will adopt a new health-based Maximum Contaminant Level (MCL) for PFOA in drinking water to 14 ppt from its previously set level of 40 ppt based upon the recommendation of the New Jersey Drinking Water Quality Institute, which was based upon the latest research on the adverse health effects of PFOA.

119.    Prior to January 2016, PFOA was an unregulated contaminant within the State of New York.

120.    On December 18, 2018, the New York State drinking Water Quality Council recommended that the State's Department of Health adopt maximum contaminant levels (MCLs) of 10 parts per trillion (ppt) for both PFOA and PFOS.

**The Village of Hoosick Falls and the Town of Hoosick**

121.    The Village of Hoosick Falls has a population of approximately 3,500 individuals and is located approximately 30 miles northeast of Albany, New York.

122.    The Village of Hoosick Falls operates and maintains the municipal water system.

123.    The Village's municipal water system has approximately 1,300 service connections.  The Village estimates that its system provides water to nearly 95 percent of the Village's residents.

124.    The Village is near the center of the Town of Hoosick, located along Route 22 in Rensselaer County.  The Town of Hoosick has a population of approximately 6,900 individuals.

125.    There are over 800 private wells that provide drinking water to those living in the Town of Hoosick.

**PFOA Use in and around Hoosick Falls**

126.    For several decades beginning as early as the late 1950s, PFOA was used in manufacturing processes at facilities in and around Hoosick Falls.

127.    One of these facilities is a small factory located at 14 McCaffrey Street ("McCaffrey Street Site").  New York State has identified the McCaffrey Street Site as a probable source for the presence of PFOA in the Village municipal water supply and local aquifer.  The State has characterized the McCaffrey Street Site as a "significant threat to public health or the environment."

128.    The McCaffrey Street Site began operation in or about 1961.  A company called Dodge Fibers Corporation owned and operated the factory at that time.

129.    Upon information and belief, in or about 1967, Oak Materials Group, Inc. purchased the assets and liabilities of Dodge Fibers, including the McCaffrey Street Site.

130.    Upon information and belief, in or about 1986, Defendant Honeywell, f/k/a Allied-Signal purchased Oak Materials Group, Inc., which included the assets and liabilities of the McCaffrey Street Site.  Allied-Signal operated the McCaffrey Street Site until 1996.

131.    Upon information and belief, in or about 1996, Defendant Honeywell (f/k/a Allied-

Signal) sold the assets and liabilities of the McCaffrey Street Site to Furon Company (Furon).

132.   Upon information and belief, in or about 1999, Defendant Saint-Gobain purchased the assets and liabilities of Furon, including the McCaffrey Street Site.

133.   Defendant Saint-Gobain has continuously owned and operated the McCaffrey Street Site from the time it purchased the Furon Company to the present.

134.   Throughout the operation of the McCaffrey Street Site, each company manufactured stain and water-resistant fabric and/or Teflon® at the factory and utilized PFOA manufactured by defendants DuPont and 3M.

135.   In manufacturing stain-resistant fabric, each company coated the fabric with a liquid solution containing PFOA (the "PFOA Solution").

136.   Saint-Gobain, Furon and Allied-Signal utilized trays for the application of the PFOA Solution to the fabric.  Employees added the solution to the trays during production runs and recovered a portion of the solution at the end of the run during each shift.

137.   During the drying process, heat would vaporize a portion of the PFOA, which was then discharged from the facility as fine particulate matter that was then transported by wind to the community.

138.   Defendants' employees, at the direction of corporate officers and supervisors, washed out and discharged the remaining PFOA Solution from the trays into drains on a daily basis during each shift.  Those floor drains resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

139.   On average, Saint-Gobain ran three shifts, five days a week at the McCaffrey facility.

140.    Saint-Gobain claims to have halted the use of PFOA at the McCaffrey plant in the coating operation around 2003. Between 2003 and 2014, it utilized PFOA-containing materials in the silicone rubber operation at the plant.

141.    Throughout the period during which Oak Industries, Allied-Signal and Furon owned the McCaffrey facility, each company also used PFOA in a solid form as a part of a separate manufacturing process.

142.    In addition to the above, Allied-Signal manufactured pressure-sensitive tapes, Teflon®-coated fabrics, and Teflon® sheet, tape and laminates while it owned the McCaffrey Street Site.

143.    Saint-Gobain also utilized PFOA in other processes at the McCaffrey Street facility between 1999 and approximately 2014.  Among other things, Saint-Gobain produced PTFE (polytetrafluoroethylene) film, adhesive tapes and silicone rubber for aeronautical, automotive, food processing and energy applications.

144.    Oak Industries, Allied-Signal, Furon and Saint-Gobain utilized six large, approximately three-story ovens as a part of their manufacturing process.

145.    The use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue. During the 1980s, Allied-Signal employees routinely burned off residue from the McCaffrey plant stacks, a process constituting "open burning" in violation of New York air pollution control regulations then in effect.

146.    Defendants Honeywell and Saint-Gobain established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

147.    Defendants' employees removed the residue in the stacks by washing the stacks in a large sink that measured approximately 3 feet by 3 feet by 20 feet in size.  At the end of each cleaning, the waste water from the cleaning was discharged down a drain and was released into a septic system or catch basin near the McCaffrey plant.  Those floor drains and other discharge points resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

148.    New York State has identified at least three additional sites in and around Hoosick Falls that are likely sources of PFOA contamination.

149.    One of those sites is located at 1 Liberty Street ("Liberty Street Site").  Saint-Gobain currently owns this site and Allied-Signal (Honeywell) previously owned and operated this facility.  In July 2017, the New York DEC classified the Liberty Street Site as a Class 2 site, meaning that the site presents a significant threat to public health and/or the environment.

150.    DEC has identified the facility located on John Street in Hoosick Falls formerly operated by Oak Materials and Allied-Signal as an additional source of the contamination. In July 2017, it classified the John Street site as a Class 2 site meaning that the site presents a significant threat to human health and/or the environment.

151.    The New York DEC has also stated that its preliminary investigation has identified PFOA within the leachate coming from the former municipal landfill and stated that it anticipates classifying the former landfill as a p-site in the near future.  DEC has measured PFOA levels of 21,000 ppt within the leachate.  The landfill is adjacent to the Hoosic River and leachate from the landfill continues to migrate towards and into the river.

152.    Upon information and belief, Defendants Honeywell and Saint-Gobain discharged PFOA into the environment through other means and at other sites that will be revealed through the discovery process.

153.    Upon information and belief, the majority of PFOA used by defendants Saint-Gobain and Honeywell was purchased from and/or manufactured by defendants DuPont and 3M.

154.    Upon information and belief, defendants Honeywell and Saint-Gobain learned of contamination of soil, surface water and groundwater beneath their McCaffrey Street facility and elsewhere in Hoosick Falls with PFOA years prior to the discovery of the PFOA contamination of the public drinking water supply in Hoosick Falls but failed to notify the Village of Hoosick Falls or the public of such contamination.

**Disclosure of PFOA Contamination**

155.    In or around 2007, the Village completed the construction of a new production well to supply municipal water to many of the residents of Hoosick Falls.

156.    The production well lies approximately 500 yards away from the McCaffrey Street Site.

157.    The Village conducted testing in fall 2014 that confirmed high levels of PFOA in the municipal water.

158.    In June 2015, the Hoosick Falls Water Department conducted tests on the effluent from its production well(s) in order to discern whether PFOA existed within the water supply.

159.    Shortly thereafter, the Village received the results from its production well(s) tests.

160.    Those tests again confirmed the presence of high concentrations of PFOA within the municipal water system.

161.    Testing of municipal water produced detections of 612 ppt, 618 ppt, 620 ppt, 151 ppt and 662 ppt for PFOA.

162.    Similarly, the Village oversaw the testing of certain private wells within the Village in the summer of 2015, and received results that included detections well above the current EPA Health Advisory level of 70 ppt.

163.    The Village's response to these test results was to reassure individuals within the community that the water was safe to drink.

164.    In October 2015, EPA Region 2 administrator Judith Enck learned of the PFOA test results taken in and around Hoosick Falls.

165.    On November 25, 2015, the EPA contacted the Village and recommended the use of an alternative drinking water source.  EPA further recommended that residents not use the municipal water for drinking and cooking.

166.    In early December 2015, the DOH released a fact sheet for the Village.  That fact sheet stated, in part, "Health effects are not expected to occur from normal use of the water."

167.    Village officials further minimized the potential risk of PFOA in the municipal water.

168.    The EPA repeated its recommendation to the Village on December 17, 2015, after learning that Village officials were downplaying the first EPA notice and suggesting that whether or not an individual used municipal water was a matter of personal choice.

169.    Unbeknownst to the community at the time, Saint-Gobain was privately negotiating with Village elected officials in an effort to minimize its liability.

170.    Shortly after the EPA's December 17 warning, Saint-Gobain began providing free bottled water to Village residents dependent on municipal water.  Saint-Gobain also agreed to fund the installation of a granulated activated carbon filter system on the municipal water system to remove PFOA from drinking water.

171.    On January 14, 2016, Healthy Hoosick Water, a local community group, sponsored a public meeting with personnel from the EPA, the DOH and the DEC.

172.    At that meeting, New York officials announced that New York State had submitted a letter to the EPA that day seeking the designation of the McCaffrey Street Site as a federal Superfund site.

173.    EPA officials acknowledged in that meeting that a Superfund designation would adversely impact the property values of the Village.

174.    During the mid-January meeting, residents dependent on private wells questioned state officials about whether their wells may also be contaminated.  State officials indicated that the DOH would test the private wells of any individual upon request.

175.    In fact, DOH put off testing most of the private wells in and around the Town of Hoosick and instead focused its resources on the wells nearest the McCaffrey Street Site.

176.    The DOH avoided providing private well testing for several more weeks.  In response to growing public outcry, however, the state finally reversed course and began testing the private well of anyone requesting it.

177.    In mid-January, a consultant hired by the state sent an email to DOH employees stating that "all of the manufacturing in the village went to the 'dump.'  Although the landfill was decommissioned and capped several years ago all of the potential PFOA rich leachate goes to the treatment plant and eventually out to the Hoosic River.  It may be alarmingly high and we need to get at least a baseline level."  Testing later confirmed that wells and soil in close proximity to the Hoosick landfill were contaminated with PFOA.  Indeed, one water sample taken from the landfill showed PFOA at a concentration above 21,000 ppt.  Upon information and belief, Defendants discarded PFOA-laden waste at the landfill for years before it was decommissioned.

178.    The Hoosick Falls school district announced on January 22, 2016, that testing identified PFOA within its well water at its transportation center.

179.    On January 27, 2016, Governor Cuomo directed state agencies to use state Superfund money to address PFOA in the Hoosick Falls' municipal water system.  The State Health Commissioner said that the Saint-Gobain plant would be deemed a state Superfund site and designated it a Class 2 site.

180.    That same day, the governor announced a temporary emergency regulation to classify PFOA as a hazardous substance.  This designation became permanent upon adoption of a final agency rule, effective as of March 3, 2017.

181.    On January 28, 2016, the EPA advised that home owners with private wells should use bottled water if testing had uncovered PFOA level in their water at 0.1 ppb (100 ppt) or higher. The EPA further recommended that home owners with private wells should use bottled water if no one has yet tested their well water.

182.    At that time, one or more local banks indicated that they would not advance funds for the purchase or refinancing of a home in Hoosick Falls.  Indeed, the Treasurer of Trustco Bank, Kevin Timmons, publicly confirmed that the bank was not writing new mortgages for any home on the Village's municipal water supply.  Timmons indicated that lenders typically require that homes have access to potable water before financing is approved.

183.    Timmons further stated that financing would not be approved for homes on private wells until the water supply was tested for the presence of PFOA.  Homeowners with private wells would later be required to prove that their water was not contaminated as a prerequisite to acquiring financing.

184.     As a result of the presence of PFOA within the aquifer, the municipal water system and private wells, the property values in and around Hoosick Falls have experienced a significant decline since the presence of PFOA was disclosed in December 2015.  That decline persists to this day.

185.     On or around February 1, 2016, United States Senator Charles Schumer called on Saint-Gobain to disclose immediately the full extent of the pollution it caused.  Senator Schumer stated, "Saint-Gobain did this.  They've got to first come clean as to what happened, where they put the stuff, and then work on a plan to quickly clean it up."

186.     On February 5, 2016, news outlets reported that some Village residents were bathing by sponge because they were afraid of inadvertently ingesting water during a shower.

187.     On February 11, 2016, DEC identified Saint-Gobain and Honeywell as the parties potentially responsible for PFOA contamination at one or more properties in Hoosick Falls, including the McCaffrey Street Site.

188.     The DEC demanded at that time that each company enter into an enforceable Consent Order to characterize and investigate the extent of the contamination, to provide interim remedial measures to protect public health and drinking water supplies, to analyze alternatives for providing clean and safe drinking water and, ultimately, to design and implement a comprehensive clean-up and remediation protocol.

189.     On February 13, 2016, DOH began offering blood testing to any Hoosick Falls residents who wished to have their blood tested for the presence of PFOA.  Over 3,000 individuals have participated in this program to date.

190.     By February 24, 2016, a newly installed interim carbon filtration system at the municipal water treatment plant became fully operational.  This carbon filtration system was

replaced with a more permanent full capacity system in February 2017.  Despite the presence of the filtration system, residents continue to rely on bottled water for drinking.

191.    On February 26, 2016, state officials disclosed results from tests performed at private wells.  Of 145 wells tested, 42 showed PFOA contamination above 100 ppt.

192.    The DEC also announced at this time that it had commenced installation of point-of-entry treatment (POET) systems for homes with private wells.  DEC stated at that time that it had received 281 requests for POETs.  Throughout the spring, residents in and around Hoosick Falls would continue to deal with frustrations relating to installation and upkeep of POET systems.  As of the date of this Complaint, the state has installed over 800 POET systems on private wells in and around Hoosick Falls.

193.    In early March 2016, the state disclosed results from water samples taken from the Hoosick Falls Water Treatment Plant in or around February 2016.  The highest sample showed PFOA at a concentration of 983 ppt.

194.    On June 3, 2016, the DEC announced that it had reached agreement on two Consent Orders with Saint-Gobain and Honeywell.  These Consent Orders require Defendants to submit a Remedial Investigation/Feasibility Study that includes, *inter alia*, PFOA remediation options and the creation of an alternate water source for the Village.  In addition, the Consent Orders require Defendants to conduct further study of the Liberty Street Site and the sites of John Street and River Road—each of which was classified as a p-site under New York law.

195.    Around the same time as DEC's announcement, state officials began releasing the results of blood testing performed in February and March of 2016.  Over the course of the following two months, DOH officials would release data gathered from testing over 3,000 individuals.

196.     Numerous residents received blood tests indicating that PFOA was present in their blood at alarming levels.  According to the DOH, the median blood level among those tested is 64.2 ug/L, a level that is 30 times higher than the stated national average level of 2.08 ug/L.  The median for men 60 and over was 91 ug/L. Studies done of PFOA background blood levels in the United States for the years 2013-2014 indicated that such levels had actually dropped to a geometric mean of 1.86 ug/ml (ppb).

197.     The 95th percentile of Americans has 5.68 ug/L of PFOA in their blood according to the data released by the NYSDOH at the time of the blood testing.  Later published data indicated that the 95th percentile level for 2013-2014 was actually considerably lower.

198.     Virtually all of the long-time residents of Hoosick Falls who were using municipal water at the time of the discovery of the contamination had levels an order of magnitude or more above background levels of PFOA in their blood serum.

199.     Moreover, all residents and former residents of Hoosick Falls, including plaintiff, have been exposed in the past to PFOA at a level that meets or exceeds some health-based comparison value. The widespread water contamination and results of the state's blood testing led to shock and fear among the residents of Hoosick Falls.  Since the results were mailed, the State has been unable to provide any reasonable health guidance to those with elevated blood levels.

## DECLARATION AS STATE SUPERFUND SITE

200.     On February 16, 2016 the Saint-Gobain McCaffrey Street site was declared a Class 2 State Superfund Site that "presents a significant threat to public health and/or the environment" by the New York State Department of Environmental Conservation.

201.     In July 2017, the Liberty Street and John Street locations were added to the State Superfund list and declared Class 2 sites as well.

## FACTS RELATED TO PLAINTIFF'S INJURIES

202.    Plaintiff Marcus Martinez was born in 1971.  Plaintiff has lived at 10 Richmond Ave., Hoosick Falls, New York from 2002 to the present and from that time has utilized water from the Village of Hoosick Falls municipal water supply for drinking, cooking, bathing, cleaning and other purposes.  From 1971 through 1995, Plaintiff lived at 21 Parsons Avenue, Hoosick Falls, New York and utilized water from the Hoosick Falls municipal water supply for drinking, cooking, bathing, cleaning and other purposes.

203.    Upon information and belief, the Village of Hoosick Falls municipal water supply was contaminated with PFOA for many years prior and plaintiff Marcus Martinez ingested this contaminated water, bathed in it and inhaled water vapor that was contaminated with PFOA.

204.    During his residency in Hoosick Falls, plaintiff Marcus Martinez also inhaled particulate matter containing PFOA discharged from defendants' Saint-Gobain's and Honeywell's facilities that was transported through the air and settled into dust and soil on his property.

205.    In 2014, plaintiff Marcus Martinez was diagnosed with liver cancer and lung cancer and thereafter was required to undergo painful and debilitating treatments for his cancer that continues until today.

206.    Plaintiff Marcus Martinez's blood was tested in 2016 for PFOA and his level measured 31.6 µg/L, a concentration significantly in excess of "average" and "background" levels.

207.     Upon information and belief, the Village of Hoosick Falls municipal water supply was contaminated with PFOA before the commencement of this action and before plaintiff was instructed not to drink the water at the end of 2015 and plaintiff ingested this contaminated water, bathed in it and inhaled water vapor that was contaminated with PFOA.

36

## CLAIM I

### STRICT PRODUCT'S LIABILITY – FAILURE TO WARN
### AGAINST DEFENDANTS DUPONT AND 3M

208.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

209.   This Claim is brought under New York law.

210.    From the 1950's through approximately 2000 Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied for sale and sold PFOA to defendant DuPont and to other manufacturers of PTFE dispersions, and to Defendants Honeywell and Saint-Gobain in the ordinary course of their business.

211.   From the 1950s through approximately 2015 Defendant DuPont developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied PFOA-containing PTFE dispersion products for sale and sold such products to defendants Honeywell and Saint-Gobain in the ordinary course of their business.

212.   From approximately 2000 through approximately 2015 Defendant DuPont developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied for sale PFOA and PFOA-containing PTFE dispersion products and sold such products to other manufacturers of PTFE dispersions, and to Defendants Honeywell and Saint-Gobain in the ordinary course of their business.

213.   By 1984 Defendants DuPont and 3M were aware of the health hazards associated with PFOA exposure as well as the potential for PFOA to contaminate drinking water.  Both defendants were also aware that there were technologies that could reduce or eliminate the PFOA emissions for PTFE coating manufacturing facilities and/or that PFOA could be replaced in PTFE dispersions with another surfactant.  Both Defendants chose to continue to sell PFOA and PFOA-

containing PTFE dispersions and not to advise purchasers of the true hazards of PFOA or instruct them about and recommend emission reducing technologies because of concerns for loss of profits to these Defendants.

214. Upon information and belief, Defendants Honeywell and Saint-Gobain utilized the PFOA and PFOA-containing PTFE dispersion products supplied by defendants DuPont and 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

215. The PFOA products sold by defendants DuPont and 3M to defendants Honeywell and Saint-Gobain were unreasonably dangerous to manufacturing workers and to residents of Hoosick Falls, including plaintiff, without adequate warnings and instructions to prevent discharge of PFOA into the environment and accumulation inside of the bodies of residents, including plaintiff.

216. Defendants DuPont and 3M knew or should have known that the PFOA products that they sold to defendants Honeywell and Saint-Gobain would be discharged into the environment and cause contamination of the water supply of and accumulation in the blood serum of residents living in the communities where their products were used, including plaintiff.

217. Defendants DuPont and 3M had actual knowledge of the health hazards associated with PFOA ingestion through both animal studies conducted by researchers employed or contracted by such defendants and through experience with each defendant's own workers, but, upon information and belief, failed to communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of them at the Hoosick Falls facilities.

218. Defendants DuPont and 3M also failed to warn and alert purchasers and users or the public of their discoveries of extensive groundwater contamination in communities located

38

near their Washington Works (DuPont) and Cottage Grove (3M) facilities once these water supplies were determined to be contaminated with PFOA or other similar fluorochemicals produced by defendant 3M.

219.    Defendants DuPont and 3M failed provide adequate instructions and warnings when their PFOA and PFOA containing products were sold and accordingly sold products that were unreasonably dangerous for their intended use and defective, making them strictly liable for the injuries sustained by plaintiff.

220.    Defendants DuPont and 3M breached their continuing duty to warn of defects in their products after learning of the extensive environmental contamination caused by PFOA in or near their own facilities and failing to pass this information on to purchasers, users and others in the communities where these products were utilized who could be adversely affected.

221.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and their PFOA-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that plaintiff's injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate plaintiff's exposure to PFOA before they contracted their illnesses.

222.    Defendants 3M and DuPont acted with reckless indifference to the health and safety of workers using their PFOA products and residents in communities where their PFOA products were used by failing to provide adequate warnings of the known dangers of PFOA when discharged into the environment and ingested by nearby residents, such as plaintiff.

223.    As a direct and proximate result of the sale of their defective PFOA product lacking proper warnings and instructions, plaintiff has suffered illnesses and damages, both economic and non-economic, which exceed $75,000.

224.    As a direct and proximate result of the sale of PFOA products lacking proper warnings and instructions, plaintiff is entitled to consequential damages covering the cost of medical monitoring and surveillance for other illnesses that may develop as a result of plaintiff's exposure to and accumulation of PFOA in plaintiff's body.

## CLAIM II

### NEGLIGENCE AGAINST ALL DEFENDANTS

225.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

226.    This Claim is brought under New York law.

227.    Defendants 3M and DuPont knew or should have known that PFOA and PTFE dispersions containing PFOA that were used in the manufacturing processes at defendants Honeywell's and Saint-Gobain's facilities would result in the release into the environment of PFOA, the contamination of the groundwater, ingestion of that groundwater by the community of Hoosick Falls, accumulation of PFOA in the bodies of members of that community, including plaintiff, and adverse health effects to those people, including plaintiff.

228.    All defendants knew or should have known that use of PFOA, PFOA-containing PTFE dispersions and/or the discharge of PFOA into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

229.    All defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA-containing PTFE dispersions onto the ground within floor drains in, and in close proximity to, the McCaffrey Street facility.

230.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks where PFOA-containing PTFE dispersions were used.

231.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA vapors to exit from stacks at the facility without adequate control measures.

232.    During some of the years of the operation of PTFE coating manufacturing facilities in Hoosick Falls defendants 3M and DuPont failed to share information and knowledge that these companies had and to provide adequate warnings and instructions to defendants Honeywell and Saint-Gobain about the hazards of PFOA to the environment and to the safety of the community.

233.    At some point in time after use of PFOA at the Hoosick Falls facilities began, either based upon information provided by defendants 3M and/or DuPont, or through published and available literature, defendants Saint-Gobain and Honeywell, knew or should have known of the environmental risks and health hazards associated with exposure of human beings to PFOA.

234.    Defendants 3M and DuPont had a continuing duty to warn purchasers of their PFOA and PFOA-containing products of risks and hazards learned by such defendants after sale of these products.

235.    Defendants Saint-Gobain and Honeywell had a duty to take all reasonable measures to ensure that PFOA-containing PTFE dispersions and/or PFOA would be effectively contained and not discharged into the surrounding environment.

236.    Defendants Saint-Gobain and Honeywell further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents of Hoosick Falls and the surrounding area.

237.    Defendants Saint-Gobain and Honeywell breached the above-stated duties by unreasonably disposing of PFOA Solution and/or PFOA in a manner that guaranteed PFOA would enter the environment, including the groundwater and be ingested by residents, including plaintiff.

238.    Defendants 3M and DuPont had a duty to warn users of their PFOA products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of soil and drinking water and the bioaccumulation of PFOA in people ingesting such contaminated drinking water.

239.    Defendants 3M and DuPont further breached their continuing duties to warn about the dangers of PFOA learned after the manufacture and sale of their PFOA and PFOA-containing products.

240.    Defendants 3M and DuPont breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of the products including employees handling and disposing of them at the Hoosick Falls facilities, to avoid discharging PFOA into the environment where it was likely to enter the ground water and be ingested by residents such as plaintiff.

241.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and their PFOA-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that plaintiff's injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiff's exposure to PFOA before they contracted their illnesses.

242.    As a result of Defendants' breaches of the various duties set forth above, the drinking water in and around Hoosick Falls, New York became contaminated with unsafe levels of PFOA which was ingested by plaintiff.

243.    Upon information and belief, defendants 3M and DuPont were grossly negligent, acted with reckless indifference to the health and safety of the public and/or intentionally failed to make public or provide to purchasers of their products information these defendants possessed about the potential danger and harm that accumulation of PFOA in the human beings resulting from discharge of PFOA into the environment could cause.

244.    Upon information and belief, defendants Saint-Gobain and Honeywell were grossly negligent, acted with reckless indifference to the health and safety of the public, and/or intentionally failed to prevent PFOA from being discharged into the environment and in failing to inform the Village of Hoosick Falls or the public in general of the potential that PFOA was contaminating its municipal water supply.

245.    As a direct and proximate result of Defendants' actions and omissions described herein, plaintiff has suffered illnesses and injuries caused by the accumulation of PFOA in his body entitling Plaintiff to compensatory and consequential damages, including the cost of medical monitoring.

## CLAIM III

## TRESSPASS AGAINST DEFENDANTS SAINT GOBAIN AND HONEYWELL

246.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length therein.

247.     This Claim is brought under New York law on behalf of Plaintiff.

248.     Plaintiff is an owner of real property with the right of possession.

249.     Defendants Saint Gobain and Honeywell negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFOA Solution and/or PFOA containing products, waste containing PFOA and/or PFOA particulate matter discharged into the air from defendants' manufacturing operations, such that these defendants proximately caused PFOA contaminants to enter, invade, intrude through the air and through the medium of the ground water and injure the right of plaintiff to possess and enjoy his property, including the soil and surfaces inside his home.

250.     Plaintiff has not consented, and does not consent, to the contamination alleged herein. These defendants knew or reasonably should have known that plaintiff would not consent to this trespass.

251.     As a direct and proximate result of these defendants' acts and omissions as alleged herein, the drinking water of plaintiff has been contaminated with PFOA, causing significant property damage, including actual, consequential, and nominal damages.

## **PRAYER FOR RELIEF**

Plaintiff requests the Court to enter judgment against the Defendants, as follows:

A.      Compensatory damages against all defendants in an amount that will fairly and adequately compensate plaintiff Marcus Martinez for his personal injuries and for property damage caused by his exposure to and ingestion of PFOA and defendants' defective products and negligent, grossly negligent, reckless and/or intentional conduct in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. §1332(a);

B.      Consequential damages against all defendants for the costs of medical monitoring and surveillance of plaintiff in the future made reasonably necessary by defendants' conduct in causing them to be exposed to, ingest and accumulate PFOA in their bodies in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. §1332(a);

C.      Punitive damages against all defendants as a result of their grossly negligent, reckless and intentional actions in harming plaintiff;

D.      An award of attorneys' fees and costs, as permitted by law;

E.      An award of pre-judgment and post-judgment interest, as provided by law;

F.      Leave to amend this Complaint to conform to the evidence produced at trial; and

G.      Such other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper.

Dated: January 22, 2019
Rochester, New York

**FARACI LANGE, LLP**

/s/Stephen G. Schwarz
By: Stephen G. Schwarz
*sschwarz@faraci.com*
Hadley L. Matarazzo
*hmatarazzo@faraci.com*
28 East Main Street, Suite 1100
Rochester, New York 14614
Telephone: (518) 325-5150
Facsimile: (518) 325-3285

**WILLIAMS CEDAR, LLC**
Gerald J. Williams
*gwilliams@williamscedar.com*
1515 Market Street, Suite 1300
Philadelphia, Pennsylvania 19102
Telephone: (215) 557-0099
Facsimile: (215) 557-0673

**CHAFFIN LUHANA LLP**
Eric Chaffin
*chaffin@chaffinluhana.com*
Roopal P. Luhana
*luhana@chaffinluhana.com*
600 Third Avenue, 12th Floor
New York, New York 10016
Telephone: (888) 480-1123
Facsimile: (888) 317-2311

**BEREZOFSKY LAW GROUP, LLC**

Esther E. Berezofsky
*eberezofsky@eblawllc.com*
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
Telephone: (856) 667-0500
Facsimile: (856) 667-5133

**CUKER LAW FIRM, LLC**
Mark R. Cuker
*mark@cukerlaw.com*
2005 Market Street, Suite 1120
Philadelphia, Pennsylvania 19103
Telephone: (215) 531-8522

*Attorneys for Plaintiff*